Filed 11/7/24  P. v. Tran CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TECH THU TRAN,<br><br>        Defendant and Appellant. | A165297<br><br>(Contra Costa County Super. Ct. No. 05001904556) |

Tech Thu Tran was convicted of willful, deliberate, premediated attempted murder, torture, aggravated mayhem and assault with a firearm. Sentenced to a prison term of seven years to life on the attempted murder conviction plus a consecutive 25 years to life on an enhancement for personal discharge of a firearm causing great bodily injury, he contends the trial court erred in refusing to strike the enhancement under Penal Code section 1385. We conclude the trial court was not required to strike the enhancement but erred with respect to some of the factors bearing on its discretionary decision whether to do so.  Accordingly, we will remand for reconsideration of the sentence.

1

# BACKGROUND

## I.

### *Factual Background*

#### A. General Background

Tran and his ex-wife Veronica[1] were married for 11 years, divorced in 2020, and have two sons, born in 2012 and 2014.  They separated in March 2018, after Veronica discovered Tran had been unfaithful, with multiple people, for years.  He moved out, at her request, but returned after a week because their son had a "horrible" week at school.  Tran and Veronica had been sleeping in separate bedrooms since before the separation,[2] and continued to do so.  In May 2018, Tran's mother died, and he moved to her house in Concord, but he stayed at the couple's Antioch house part or all of the weekends to be with the children.

Veronica met Nicholas Collaco in May 2018, when she contacted him to invite his six-year-old daughter to her son's birthday party.  Collaco was single and Veronica told him she was separated.[3]  They continued to communicate, their texts progressed from casual to flirty, and they got together one morning in the backyard of Veronica's house, smoking marijuana while her children were inside, and another time at Collaco's

---

[1] We refer to Veronica Tran by her first name to avoid confusion.  No disrespect is intended.

[2] Veronica testified that they slept in separate rooms because she was breastfeeding and taking care of the children; she slept with them in one of the downstairs bedrooms and Tran slept in the master bedroom upstairs.  She and Tran were still physically intimate during these years.

[3] Collaco testified that Veronica told him Tran "didn't really live at the house"; she testified she did not tell him where Tran was staying but later acknowledged having told the police that she told Collaco that Tran was not living with her during the week.

house, where they kissed but did not have sex. In continuing text communications, they discussed interest in having sex with each other and exchanged naked photographs of each other. Veronica did not tell Tran about her relationship with Collaco, and Tran was not aware of it. She deleted text exchanges with Collaco from her phone because she did not want Tran to know about him.

### B. The Events of July 22 and July 23, 2018

#### 1. *July 22 Afternoon and Early Evening*

On the afternoon of July 22, 2018, Veronica, Tran and their sons went to a birthday party. Tran was going to be staying at the Antioch house. Veronica testified that she and Tran both drank alcohol at the party, but she drank more, as Tran was the "designated driver." Tran testified that he had about ten shots of alcohol and three to four beers at the party.

Veronica and Collaco had discussed possibly getting together that evening at his house. At 4:49 p.m., Collaco texted Veronica that he would probably be available late that night. She responded, "I think I'm staying in tonight" and said she was still at the birthday party. Collaco said she should text him later and she replied, "Okay. Text me when you're back and we'll see." Veronica testified that she gave her cell phone to her son to play on and did not get it back from him before the family left the party at around 8 p.m. When they got home, Veronica went to the bathroom to throw up from the alcohol she had been drinking. She was in the bathroom alone for "a while," possibly more than an hour, then went to bed in the room she shared with her sons. She did not have her cell phone with her in the bathroom or bedroom. Tran knew the passcode to her phone.

Veronica testified that she woke up to the police pounding on the garage door. She did not remember Tran waking her up but acknowledged

3

that a transcript of her interview with the police showed she told them Tran woke her up, angry, saying he wanted a divorce and knew she had been cheating on him.

## 2. *The Text Exchange*

Collaco was questioned in detail about texts between his cell phone and Veronica's on the night of July 22 to 23 that were documented in trial exhibit 3. At 8:56 p.m., he received a message saying " 'Hmm what you all about? How's your night?' " He replied that he was heading home and asked if she was good at giving massages because he had a bad migraine and would love to have her rub his back and shoulders. Once home, he asked if she was still at her party, and she replied that she was. He texted, " 'Come over.' "

The next text Collaco received asked, " 'You sure?' " He said, " 'You can come now if you want,' " and she responded, " 'For what?' and a smily [*sic*] face or a wink emoji." He replied with a photograph of himself, shirtless. She texted that her husband was home, Collaco asked if that was a problem and she said " '[y]es.' " Collaco asked why and she responded that her kids were tired and she could not get away. He asked, " 'I thought you were free tonight?' " She responded, " 'Maybe I can sext you.' " Collaco did not recall her having used the term "sext" before and Veronica testified that she had never used it in texts with him. He said " '[y]ea,' " she said, " '[t]ell me what you miss about me' " and he said, " 'Girl, you should bring that sexy ass here.' "

Veronica next texted, " 'What was your address again? Maybe I can sneak away. I wanna hella smoke with you.' " Collaco thought this was "[a] little bit odd" because she already had his address and had been at his house recently. He texted, " 'I want your sexy ass naked in my bed while I smoke this joint,' " sent his address and said, " 'Stop playing. Come over.' " They

4

exchanged a few sexually explicit messages, then she texted, " 'How many times have we fucked now . . . you probably don't even know or remember. So I bet you want more then.' " This was "odd," because they had not had sex, and Collaco became concerned that "maybe it wasn't Veronica." He responded, " 'Umm we haven't.' "

Shortly after that, at about 11:10 p.m., he called Veronica's phone but there was no answer. He then received a message saying, " 'Sorry, I can't talk right now,' " with "a kiss emoji." The next message said, " 'Sorry. You are so hot and I want to too. But I can't,' " and he thought "it could possibly be Veronica." He texted, " 'So I take it I won't see you tonight then?' " and she replied " 'you can probably get another night' " and sent a nude photograph that he recognized as one she had sent a week or so before. Collaco became concerned again, wondering why she would send the same photograph she had already sent, then received a text saying, " 'Just have this for now. If you can tell me how we met . . . that might turn me on.' " He thought this was "another red flag" and was suspicious it was not Veronica texting, but he texted, " 'I want you. Right now.' " Her next text said, " 'I might just come over.' " Still trying to figure out whether he was talking to Veronica, Collaco texted, " 'Shouldn't you know how we met . . . WTF,' what the fuck." He then said, " 'It sound like your ex has your phone.' "

The response was another naked photograph of Veronica that he had received before, then " 'Trust me I want you.' " Collaco responded, " 'Anyways, come by or just hit me later,' " and received, " 'Goodnight, Nic.' " He did not think she had referred to him by name in prior conversations, but if she did, she spelled it "Nick," not "Nic." He said goodnight, received " 'So are you' " and a kiss emoji, responded " 'Your lame,' " and a kiss emoji, then texted, " 'Really sound like your ex got your phone. And if it is, no disrespect

5

hommie. I been in your position too, so nothing personal to you man. This just some adult stuff we all gotta deal with, ya feel me?' " The response was " 'Goodnight sweetie. You are trippin' too much,' and a kiss emoji." Back to thinking "maybe it was just her," Collaco texted, " 'Okay maybe I am LOL,' " said he would be up late if she still wanted to come over and " 'I keep thinking of your perfect ass all on me.' " He received, " 'All that trippin' . . . you still textin',' and a kiss—a kiss emoji and a laughing face—laughing emoji." Collaco was unsure whether it was Veronica responding but texted, " 'Umm yea I want that sexy ass' " and the reply was, " 'It just turns me on more when a [*sic*] actually pays attention and listens . . . I know I am weird.' " Collaco thought this was "most likely Veronica."

At this point, Collaco had left his house and gone to a Jack in the Box about 10 to 15 minutes from Veronica's house. He texted, " 'I can come to you and just smoke in my car. I'm at Jack in the Box right now.' " He received, " 'Too far for you to come. Plus kids are sleeping. And my neighbors . . . are hella nosey.' " He thought it was odd that she said it was too far because "it was actually fairly close." He then received, " 'You don't even know where I live,' " After saying it was " 'definitely not too far,' " and wanting to test whether he was communicating with Veronica, Collaco texted, " 'I only slept over like 20 times LOL, remember I was hella faded the other day.' " He had never slept at Veronica's house. The response was, " 'Sure. . . stupid. . .' " and Collaco wrote, " 'LOL.' " He received, " 'Okay come. But you have to promise . . . me that we'll only smoke.' " After he said " 'Okay,' " she said to come to

the back yard because her neighbors were nosey, and he said he would be there in about five minutes.[4]

### 3. *The Attack*

Collaco testified that he arrived at Veronica's house and, at 12:32 a.m., texted that he was there. The reply told him she had unlocked the side gate and he should come through it, wait in the back yard, " '[h]ave the smoke ready' " and she would be right down, with a kiss emoji. Collaco found the side gate closed and texted, asking where she was and saying he felt " 'weird just waiting in the back yard.' " She said her son had started crying, apologized and asked him to wait and be patient and quiet, sent a kiss and said " 'It's open.' " He texted that it was locked and asked if he should push it. He did not receive a reply and pushed the gate, which felt "a little stuck" but opened slowly.

There was no light coming from the house or a streetlight, but Collaco's phone was open in his hand. He did not see anyone, said " 'Veronica?' " and took one step through the gate with his right leg. As he did so, he saw a male figure, identified at trial as Tran, coming around the corner of the house, about 15 feet away, with what appeared to be a gun pointed at Collaco. "[A]lmost instantly," Collaco was shot in the hip and legs. No words had been exchanged. Collaco's legs gave out and he fell on his back. Tran immediately ran toward Collaco with the gun pointed at Collaco's face, kicked the gate closed behind Collaco, screamed something like, " 'You think you can fuck my

---

[4] Veronica testified that she had not sent the texts that Collaco found suspicious: For example, she never used the word "sext" when texting with Collaco; she already had his address, she would not have asked about times they had had sex because she had never slept with him, she did not send him the photos that night that she had previously sent him, and she did not refer to him as "Nic" or "sweetie."

wife,'" and "started smashing [Collaco] on the head with the barrel." Collaco pleaded, "'I have a little girl. Don't kill me.'" Tran said, "'I want to beat your face,' or, 'I'm gonna bash your face in now.'" Collaco believed Tran struck his head and face at least 20 times.

As Tran continued to strike him with the gun, Collaco managed to lift himself up enough to grab the gate and pull it open, then just outside the gate his legs gave out again and he crawled toward the street as fast as he could, using his arms and core and dragging his legs behind him. Tran was striking Collaco with the gun "nonstop." Collaco rolled onto his back, partly due to a "really hard blow" and also because he was unable to crawl any further, felt the blows to the back of his head were going to be fatal, and thought his best chance of survival was to see the blows coming and dodge them as much as he could, which he did by moving his shoulders and head in an alternating fashion. Tran continued to hit him repeatedly. Some of the blows landed on his neck, front and back, and Collaco sustained burns on his arms, shoulders and chest because the barrel of the gun was still hot. Another person came out and exchanged words with Tran, who hit Collaco on the head at least two more times and then stopped and left the area. Unable to move, Collaco was still on his back when the police arrived. He no longer had his cell phone and did not know where it was. Collaco told a police officer who arrived, "'I think I've been set up. Someone messaged me to come here and to murder me.'"

Michael Mandy, who lived across the street from Tran's house, testified that around 12:40 a.m. on July 23, 2018, he heard "loud banging, popping noises" outside that sounded very close. He looked out the window and saw two people in the street, one standing and one on the ground shouting something like, "'Don't take my life. Look at my phone.'" Mandy opened his

8

front door, heard the person on the ground screaming and called 911. A recording of the call was admitted into evidence and played for the jury. Mandy did not see the standing person assault the person on the ground.

### 4. *Police Response and Investigation*

Antioch police officer Matthew Davis arrived at Tran's address at about 12:51 a.m. on July 23, 2018. Collaco was "lying about five feet into the street kind of in a seated position." Davis saw a laceration on Collaco's forehead and what appeared to be bird shot wounds in his upper thighs. He was bleeding from his head and from the bird shot wounds. Collaco was panicked, in shock and appeared to be in severe pain. He spontaneously said that Tran beat him, tried to kill him, and texted him from his wife's phone to come over.

Davis searched Collaco and found no weapons, then asked dispatch to tell Tran to come outside.[5] The officer asked Tran where the firearm was and Tran directed him to the left side of the house. The gate was torn off the hinges with some of its wood broken, leaning against the house at an angle so that Davis had to step over it to get through. There was blood on the gate, the ground next to it and the wall of the house. Davis saw a live shotgun shell on the ground. He found the firearm on top of the air conditioning unit at the corner of the house. It contained no live rounds and there was blood residue on it, including along the barrel. The gun was registered to Tran. Davis found two cell phones in one pocket of Tran's shorts and three live shotgun shells in another pocket. Tran said one of the phones was his and the other was his wife's. The shells were consistent with the firearm, as was the shell Davis found on the ground. Tran was "relatively calm" and "[v]ery cooperative."

---

[5] The police initially believed Collaco was a suspect.

9

Officer Ryan Duff was the second officer on scene. Collaco was lying in the street, alone, bleeding from his head, and appeared to have been shot in the leg with a shotgun. He was moaning, in pain and in distress. Collaco said "something to the effect of, Don't let him get away with this." When Duff asked what he meant, Collaco said he came to the house to meet a female friend, her husband shot him with a shotgun and he thought the husband had been using the friend's phone "to get him to come over." Collaco, frantic, told Duff, "You have to find my phone because the text messages are on there." The police found the phone in the backyard of the house directly to the south of Tran's. The phone's screen was cracked and there appeared to be blood on it. Duff opened it with Collaco's passcode, and the text messages seemed to corroborate what Collaco had said.

Police officer Price Kendall located a shotgun case on the floor in the upstairs bedroom of Tran's house and shotgun shells on the floor next to the case. In the side yard, the officer found blood on the side wall of the house and fence, one live shotgun shell and one spent shotgun shell and a trail of blood from the gate to where Collaco was found. Kendall observed two areas of pooling blood, one on the ground by the broken gate and one where Collaco was found on the street.

Kendall contacted Veronica, who appeared to be intoxicated and not cognizant of what had happened. A recording of the interview was played at trial. Veronica said she had asked Tran if he had her phone and he said yes, and that Tran woke her up and said she was cheating on him and he wanted a divorce. Kendall asked why Collaco was coming over that night and she "stated, kind of jokingly, I don't know maybe to get some."

Police Detective James Colley interviewed Collaco at the hospital at about 10:30 a.m. on July 23. Collaco said that when he opened the gate at

Tran's house, he saw a silhouette of what he thought was a man holding a shotgun. He told Colley that as he was trying to escape from the backyard after being shot, Tran was "telling him stuff"; that Tran was striking him in the head with the barrel of the shotgun; and that once he was outside the gate, Tran also struck him with the butt of the gun.

Colley and Detective Meals spoke with Veronica later that day. She told them that she did not have her phone after giving it to her child at the birthday party and that Tran woke her up and said he was aware of her affair and wanted a divorce. The following day, Colley and Meals showed Veronica a printout of the text conversation found on Collaco's phone and she said the last text she sent him was the one saying " 'Text me when you are back and we will see.' "

Data extracted from Tran's cell phone showed that at 12:17 a.m. he searched on the internet for "red means dead safety," then deleted the search. Tran's shotgun had a safety feature consisting of a button on the trigger guard used to switch the weapon in or out of safe mode; the button displays a red ring when ready to fire that is not visible when the gun is in safety mode. "[R]ed means dead" is a term for taking off the safety so the gun will shoot when the trigger is pulled.[6] The extracted data showed that Tran called 911 at 12:46:34 a.m. The last outgoing message from Collaco's phone was at 12:44:03 a.m.

### 5. *Collaco's Injuries*

Collaco spent about two weeks in the hospital. When he first arrived, his right leg "looked like spaghetti . . . a lot of blood and tissue"; the left was

---

[6] The police detective who performed the cell phone forensic download and testified as the People's expert in this area testified that this search drew his attention. He knew the meaning of the search from "having owned a shotgun and having a shotgun in my patrol car every day."

"similar," but the right was worse. The injuries to his right leg required emergency surgery; he had three surgeries on his right thigh and the leg was immobilized for almost two weeks. He had significant pain in both legs for a few months, and still experienced pain in both at the time of trial in November 2021. He still had approximately 100 shotgun pellets in his right thigh and about 20 to 30 in the left thigh, a long scar from the surgeries on his right thigh and smaller scars from the shotgun pellets and scarring on his left thigh. On his right leg, he still had numbness on the heel and parts of the calf and thigh, he had pain in both knees when he stood too long, and the right knee would sometimes get swollen. It was a year after the attack before he could walk unassisted, and he still walked with a limp at times.

Lacerations on Collaco's head required a total of 30 staples and he received three to six stitches on his left eye socket. He had four chipped teeth, which he did not have repaired due to the cost. At the time of trial, Collaco had multiple permanent scars on his head, permanent tenderness on his head that caused migraines, numbness above his right ear, and partial numbness on the back of his head. He could not read for a few months after the attack due to blurry vision and it remained difficult to read for a prolonged time because the effort to focus would cause a headache or migraine. He had migraines frequently, "almost every other day at times," had to wear dark sunglasses to prevent triggering migraines because his eyes were very sensitive to light and had become sensitive to loud noises, none of which had been the case before the attack. He also had permanent scarring on his right shoulder, which still "click[ed]" and became "tight" at times; permanent scarring and tenderness to the skin on his chest; and pellets in his scrotum, which remained "[a] little sore."

Prior to the attack, Collaco had been an avid runner, running five miles a day and engaging in marathons, and played a lot of sports. Strenuous activity now triggered migraines, and he could not run due to the amount of muscle loss in his leg. He had not been able to return to work, his ability to do household tasks had been affected and he sometimes had difficulty with stairs. He was unable to drive for a few months because sitting was uncomfortable and prolonged driving still caused numbness or discomfort. The attack also left him sometimes feeling worried and "a little paranoid" in public.

## C. Defense

### 1. *Tran's Testimony*

Tran testified that on the night of the shooting he was not trying to murder Collaco, intending to disfigure or cause him extreme pain, or planning to lure him to the house in order to get revenge for his texts with Veronica. Tran was not mad at Collaco; he was mad and upset at Veronica, but it never occurred to him to assault Collaco in order to get back at Veronica. Tran testified that he regretted shooting Collaco and striking him with the gun, did not know why he had done so, and had never done anything like this before.

#### a. Tran's Background

Tran was born in Vietnam and moved to San Francisco with his family when he was three years old, living in the Tenderloin. His parents split up when he was five, and he and his sister lived with their mother while his brother went with their father. Starting when Tran was seven years old, there were several periods when they were homeless, staying in shelters or sleeping on church pews or on the street in front of stores. His mother had a severe drinking problem, he did not have enough to eat and there was "a lot

13

of prostitution and drug dealers everywhere." His grandfather beat him, his mother and his sister. On multiple occasions when he was seven to ten years old, his mother's boyfriends physically and sexually abused her in Tran's presence. At age seven, Tran was sexually abused by a priest on about eight occasions and he was sexually abused by a friend's older brother for about a year when he was nine.

Tran and his mother and sister moved to San Jose, where they lived in an apartment that lacked water and electricity. His mother's alcohol problem was getting worse and his sister, at age 16 or 17, became pregnant and "started partying" with their mother. They moved to Oakland when Tran was around 13 and lived in an apartment above a Chinese restaurant, getting electricity by running an extension cord from the laundry room downstairs and using water the restaurant kept in buckets in the back.

Tran finished high school and was accepted at the University of California, Berkeley, but when his family was again evicted, he moved with his mother and his sister's four children to Southern California. Tran helped his mother take care of his nieces and nephews, got a couple of jobs and started taking care of the bills and household responsibilities. While continuing to work "[n]o less than three jobs," he enrolled in a community college and later transferred to Cal State Fullerton and graduated with a degree in sociology.

Tran and the family, now including his father, moved to Vallejo in 2006. He married Veronica in 2009. His family responsibilities further increased, as he had to take care of their household as well his parents and nieces and nephews. While working three jobs, he continued his education in social work and graduated in 2013. He purchased a home before his 30th birthday, something he was very proud of. His professional responsibilities

increased, and between 2013 and March 2018 he worked no less than 70 hours a week, including working on weekends "[a]ll the time." He also continued to help his extended family. Tran felt constant pressure.

Tran thought his marriage was "fine" but "[t]here were things here and there." These included Veronica no longer sleeping in the same bed as him, not wanting to go to functions with him and inhibiting him from seeing the children by putting them to bed before he got home, even when he came home at 5 or 6 p.m. He and Veronica continued to spend evenings together, shared favorite shows and ate dinner together, but did not have sex as much as he would have liked. He did not think his marriage was in danger.

Tran was unfaithful to Veronica "[o]n and off" throughout their marriage with some 50 to 100 people, typically anonymous one-night stands. Veronica found out in March or April 2018, when she found the app Tango on his phone. He initially denied it, then eventually "fessed up." Tran testified that Veronica was "heart broken" and "destroyed"; she had often told him she hated her father because he cheated on her mother, and "here I am doing the same thing to her."

Veronica kicked Tran out of the house briefly. When he returned a week or so later, she was distant and angry and he was depressed. But he still had hope for the marriage because Veronica sometimes acted as if "everything was okay," they still did routine things together, watched their TV shows, talked about their days and had sex. In March and April 2018, Tran was very depressed and wanted to end his life. He talked to his friend Kevin every day and cut back on work to spend more time at home. In late May, his mother was placed on life support and he had to make the decision to take her off. Veronica was not supportive during this time. She told him to move out the day his mother died, and he moved into his mother's house

15

with his nephews, spending weekdays there and weekends at the house in Antioch.

Tran still wanted to be married to Veronica.  At the beginning of July the family took a two-week trip to Portugal that had been planned a year in advance.  He was happy to have time with his sons and thought it would be a good time to reconnect with Veronica, but that did not really happen.  They returned from the trip on July 19 and Tran stayed at the Antioch house.

### b.  The Events of July 22-23, 2018

Tran testified that on July 22, they "woke up . . . as a family" and went to the movies, then did their "regular family routine."  He acknowledged that he had a couple of shots of hard liquor before going to the movies that morning.  That afternoon, they went to a birthday party with families from the children's school.

After arriving at the party about 4:30 p.m., Tran and Veronica did not spend much time together.  Both were drinking alcohol, and Veronica was smoking marijuana.  They left the party around 10:00 p.m.  Tran's son had had Veronica's phone at the party and was holding it as Tran put him in the car.  Veronica had told him she was throwing up in the bathroom at the party and she was helped to the car by friends.  At home, Tran helped her to the bathroom, then put the boys to bed.  He took Veronica's phone from his son's lap and put it in his pocket.  While Veronica was in the bathroom, she asked for her phone several times when Tran checked on her, but Tran did not give it to her.

Tran put the phone on the charger in the bedroom and when he plugged it in, a message appeared from "Nicholas" saying "Come over."  Tran testified that he had never heard this name and wanted to know who the person was and why he was texting Veronica to come over at this hour.  He

16

later told the psychiatrist who evaluated him for the defense, " 'When my marriage appeared to be dissolving and I read the texts of "Coming over" I felt like everything I ever worked hard for went down the drain at that moment.' "

Tran testified that he entered Veronica's passcode and quickly texted back "something to the effect of what or are you sure." After one or two exchanges, Nicholas texted a "half naked" picture of himself. Tran acknowledged he was pretending to be Veronica; asked why he didn't say "this is her husband, what's up?" Tran testified that the thought did not cross his mind and said he did not think he would have gotten any information that way. Tran was angry and upset at Veronica because "[s]he was raking me over the coals for months now for cheating on her and here she is doing the same thing to me." Tran looked at the call and text history on Veronica's phone and did not find anything connected to Nicholas. He found a couple of naked photographs of Veronica and sent them to Nicholas in his effort to convince him that Tran was Veronica. While texting, Tran was pacing all around the house. He took screen shots of the text conversation and sent them to his phone and then to a friend because he knew he would end up deleting the messages from Veronica's phone and "wanted proof so [he] could address Veronica with it." His plan was to say, "Hey look, you are calling the kettle black. Let's resolve this. Let's be a family." He later testified that he deleted some of the texts on Veronica's phone after taking screen shots of them, and deleted more after the shooting, because he did not want Veronica to see them.

Tran testified that he gave Nicholas "quite a few reasons" for declining Nicholas's persistent invitations for Veronica to come to his house, told Nicholas not to come to Veronica's and tried to end the conversation. He was

17

then alarmed by the text in which Nicholas said he had been to the house 20 times and referred to being "faded," because Nicholas was saying he had been at the house 20 times, "around my kids," "under the influence." He told Nicholas to come over because he wanted to meet him, not because he was angry at him. With Nicholas on the way, Tran started to feel nervous, not knowing what to expect. He had no plan, he was just "pacing around the house not knowing what to do" and "crying a lot." He tried to call Kevin but got no answer. At some point, he helped Veronica get from the bathroom to the downstairs family room, but he did not say anything to her about Nicholas.

Tran got the shotgun he and Veronica had purchased in 2016 for home protection, which was kept in the master bedroom closet. Tran had last held the gun when he bought it and had never fired it. He undid the trigger lock but had only a vague memory of how the safety worked. He remembered the salesperson saying " 'Red means dead' " and looked this up, not to take the safety off and shoot someone but to "make sure that it was safe so it wouldn't go off accidentally." He acknowledged that he deleted this search from his phone but denied doing so to keep the police from seeing it when they arrived.

Tran grabbed a handful of birdshot shells from a dresser drawer, put one in the gun and the others in his pocket, then went to the backyard and placed the gun against the deck post.[7] Tran did not plan to shoot Collaco,

---

[7] Tran testified that when he purchased the gun and ammunition, he was not told how many pellets were inside a birdshot shell or shown pictures of people shot with birdshot. He and Veronica had said they wanted ammunition that would "just spray and be non-lethal," to stop an intruder so they could call emergency services, and his understanding was that this is what birdshot would do.

18

never thought about hurting him and had no reason to believe he would be armed.  Asked why he got the gun, Tran testified, "I didn't know who this person was. · He's been over to my house. · He knows the layout. · He's been intoxicated before. · He's coming over again. · I didn't know what would happen, so I just wanted to be safe."  Tran did not think about getting a knife or bat, although there were a number of each in the house.

Tran was inside the house when he got the text saying Collaco had arrived.  He went to the backyard and texted Collaco to come there.  He heard the sound of the gate open and shut and saw Collaco come around the corner from the side yard into the backyard.  Tran picked up the gun and shot Collaco one time, aiming at his right leg.  He did not know why he did this; he testified, "It just all happened.  There was not really a decision-making point."  As Collaco staggered back, Tran went toward him and started hitting him with the butt and barrel of the gun.  Again, he did not know why; he "really wasn't thinking."  Collaco back-pedaled and made it to the gate, where he fell down.  On cross examination, shown pictures of the scene, Tran acknowledged that there was no blood in the place where he said he shot Collaco or in the alleyway where he said Collaco backpedaled toward the gate, and that there was a pool of blood just inside the gate, where Collaco said he was shot.

Tran denied ever saying, " 'You think you can fuck with my wife,' " kicking the gate shut or continuing to hit Collaco in the head as he tried to crawl out of the yard.  He thought he only hit Collaco a couple of times but saw from the evidence that it was more than that.  He remembered Collaco saying, " 'Don't kill me.  I have a daughter' " and did not strike him after that.  The gate broke as Collaco was going out.  Tran did not pursue him.  He testified, "I guess I just snapped out of it and there was no need to."

Tran put the gun on the air conditioning unit, went inside and confronted Veronica, saying he knew she had been cheating and he wanted a divorce. He then went outside and called 911. The recorded call was played at trial. Tran told the dispatcher a burglar had tried to break into his backyard and house, he had the man "sitting on the floor," his neighbors were there, he did not know the man, he had shot the man in the leg, and the gun was now in the backyard.[8] He lied because he was scared, knew he was in trouble and did not want to get into more trouble. This was not something he had planned, it was "just in that moment."

While calling 911, Tran heard Collaco say something like "Get my phone." Tran went to his backyard, found Collaco's phone and threw it into someone else's backyard. He did not remember why; he just "didn't want him to have his phone." Tran saw Collaco by the curb in the street and saw his neighbor, Mr. Cunningham. He approached them but did not try to kick Collaco. Cunningham got between Tran and Collaco and pushed Tran back, and Tran lied to Cunningham, saying Collaco had tried to rob his house.

The police arrived shortly after Tran called 911. Tran acknowledged that he was calmer at this point and that he continued to lie. His recorded conversation with the first officer who arrived, Officer Davis, was played at trial. Tran acknowledged that he told the officer he did not know what type of ammunition he put in the gun, testifying that he "didn't want to appear to be . . . a gun guy." He admitted that he falsely told the officer he thought Collaco was going to attack him and his family, Collaco swung at him, and Collaco had a weapon, and that he continued to lie when he was interviewed

---

[8] When the recording was first played, the jury was instructed that Tran's statements were not admissible for their truth, only for how they might bear on his state of mind. Subsequently, the recording was played during cross examination and admitted for its truth.

at the police department a few hours after the shooting and in a third interview the following day.

## 2. *Expert Testimony*

Dr. Mikel Matto testified as an expert in psychiatry and addiction medicine, with a specialty in trauma related disorders.[9] Retained by the defense to evaluate Tran, he interviewed Tran, reviewed materials related to this case and administered psychological tests designed to determine whether a person is malingering—intentionally feigning symptoms for secondary gain such as avoiding consequences for criminal activity. Dr. Matto determined that Tran was not malingering. He diagnosed Tran with "other specified trauma and stressor related disorder" (trauma related disorder), which he explained was a generalized diagnosis; he ruled out post traumatic stress disorder (PTSD), which is one type of disorder under the umbrella of the more general diagnosis, because Tran did not have all of the symptoms required by the specific diagnostic criteria for PTSD. Dr. Matto also diagnosed Tran with major depressive disorder and alcohol use disorder.

Dr. Matto opined that Tran suffered from trauma related disorder on July 23, 2018. Individuals with trauma related disorders often have an exaggerated response to stressors, especially ones related to the trauma. This can include a more intense form of the "instinctual" fight or flight reaction that all people share, as well as a lower threshold to trigger the

---

[9] Dr. Matto is an assistant professor of psychiatry at the University of California, San Francisco, medical school and site director for the Forensic Fellowship Training Program at the San Francisco "VA" (Veteran Affairs Medical Center), where he is also the medical director of a drop-in clinic for veterans seeking care for mental health issues. He also has a part-time forensic psychiatry practice and, as a major in the California Army National Guard, is the psychiatrist for the 40th Infantry Division. He had conducted trainings on the subject of trauma for both defense attorneys and prosecutors.

21

reaction. These episodes typically do not last long: The adrenal response, including faster heartbeat, sweating, dilation of pupils and possibly tunnel vision, lasts as long as the threat is present, but physiologically it cannot "last forever." The body "comes down" once the threat is removed (in the perception of the person experiencing the reaction), but there is a lag before the person is no longer "revved up." A person would not have periods of "normal behavior" while in the midst of a fight or flight response.[10]

Dr. Matto explained that childhood trauma can affect brain development and have a "huge" impact throughout life, and neglect can have as profound an effect as physical abuse. He testified that the childhood trauma Tran described was "very much related to relationships in the way he's experienced some of these in his feelings of lack of self-worth, in his fears of abandonment."[11] This would make a stressor related to relationships or abandonment significant in terms of decreasing the threshold for "reaching

---

[10] Dr. Matto's report stated that Tran "described a reaction with a dissociative-like state found in individuals with trauma-related disorders in which he described being 'in a fog' until he 'snapped out of it' after the perceived threat was eliminated by the shooting." At trial, although Dr. Matto was questioned about what a dissociative state is, he was not asked, and did not testify, whether Tran was experiencing such a state at the time of the offenses. He did testify that dissociative states can last "as little as seconds" and "don't last more than hours," and that it would be "very unusual" for one to last three hours.

[11] Dr. Matto testified, "So in Mr. Tran's case, from my review of the materials and discussions with him, having these profound sexual assaults, one lasting, I believe, a year when he was nine, one lasting—shorter interval when he was six, that plus the physical abuse from his grandfather, the witness abuse of his mother and his sister, the horrible neglect growing up in terms of him having very high responsibility in an erratic household, being around crack in the home, losing electricity, periods of homelessness, all of these forms of trauma growing early on, left him very susceptible particularly with relation to relationships."

fight or flight."[12]  In the midst of the fight or flight response, an individual can react to the stressor in ways they would not otherwise intend, such as reacting as if in a life or death moment to a situation that is not life or death.[13]

### 3. *Additional Witnesses*

Another of Tran's neighbors, Michael Cunningham, was awakened by a noise and heard what sounded like someone moaning.  "Five or eight" minutes later, he went outside and saw a person sitting in the street with his hands behind him and his right leg extended.  No one else was outside.  Cunningham then saw Tran coming toward him.  Tran was "seriously upset" and "kicked at" the person on the ground, and Cunningham got between them and pushed Tran back.  The man on the ground looked like "somebody roughed him up a little bit."  Cunningham never saw Tran with a shotgun.

Jennifer Khaw worked with Tran for about four and a half years at a social and mental health services agency and they became friends.  Based on their work together and friendship, Khaw opined that Tran is a "peaceful and nonviolent person" who could make rational decisions in the heat of the moment and remain calm in high-stress situations.  She testified that Tran had been able to work with a client who was often physically or verbally

---

[12]  Dr. Matto stated in his report that Tran's trauma related disorder produced an exaggerated emotional response to "the perceived loss of one of his few remaining close relationships."

[13]  Dr. Matto was not able to determine whether Tran was experiencing a major depressive episode on July 23 because "so much was going on" that it was difficult to say whether he was having a depressive episode or "it was the events that were happening that made him feel bad."  A person with major depressive disorder has it all the time, but episodes come and go.  Alcohol use disorder is also a chronic condition, but Dr. Matto could not determine whether Tran's alcohol consumption at the time was sufficient for acute alcohol intoxication.

aggressive and other social workers had not been able to serve, and she described several examples of situations in which Tran had been able to de-escalate potentially dangerous situations. She never saw Tran lose his temper or have an angry outburst at work and he did not get upset easily. Knowing what happened on July 23 did not change Khaw's opinion of Tran's character because she believed he was "in a severely traumatized state to do those things."

## II.

### *Procedural Background*

An amended information filed on August 6, 2019, charged Tran with attempted willful, deliberate and premeditated murder (Pen. Code, § 664/187, subd. (a))[14] (count 1); aggravated mayhem (§ 205) (count 2); torture (§ 206) (count 3); and assault with a firearm (§ 245, subd. (a)(2)) (count 4). Counts 1, 2 and 3 each alleged an enhancement for personally and intentionally discharging a firearm, causing great bodily injury. (§ 12022.53, subd. (d).) Count 4 alleged an enhancement for personal use of a firearm. (§ 12022.5, subd. (a).)[15] Tran pleaded not guilty and denied the enhancement allegation.

After a jury trial, the jury found Tran guilty on all counts and found the enhancement allegations true. On May 15, 2022, the trial court sentenced Tran to seven years to life on count 1, the sentence required by law (§§ 664, subd. (a), 3046, subd. (a)(1)), plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The court stayed the same sentence on counts 2 and 3 (§§ 205, 206.1) pursuant to section 654, as well as middle

---

[14] All further statutory references are to the Penal Code.

[15] Counts 1, 2 and 4 also alleged enhancements rendering Tran ineligible for probation due to personal use of a firearm (§ 1203.06, subd. (a)(1)).

24

terms of three years for the assault (§ 245, subd. (a)(2)) and four years for the enhancement (§ 12022.5, subd. (a)) on count four.

Tran filed a timely notice of appeal on May 18, 2022.

## DISCUSSION

Tran asked the trial court to exercise its discretion under section 654 to impose a determinate sentence by selecting count 4 (assault with a firearm) as the principal term and staying punishment on the remaining counts, which carried life terms. Alternatively, if the court imposed a life term, Tran urged it not to impose punishment on the section 12022.53, subdivision (d) enhancement in the interests of justice, pursuant to the amended section 1385. The trial court denied both requests. This appeal challenges only the court's decision not to dismiss the enhancement or reduce it to a lower term. Tran argues that one of the mitigating circumstances described in section 1385 required the trial court to dismiss the enhancement and that the trial court abused its discretion with respect to two other mitigating circumstances by misapplying the statutory standards.

### I.

### *Section 1385, Subdivision (c)*

Effective January 1, 2022, the Legislature added subdivision (c) to section 1385. (Stats. 2021, ch. 721, § 1.) Subdivision (c)(1) of the amended statute requires the court to dismiss an enhancement "if it is in the furtherance of justice to do so" and subdivision (c)(2) "specif[ies] mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 16 (*Lipscomb*).) Subdivision (c)(2) provides, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence

25

offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. "Endanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

Three of the mitigating circumstances are relevant here: "The application of an enhancement could result in a sentence of over 20 years" (§ 1385, subd. (c)(2)(C)), "[t]he current offense is connected to mental illness" (*id.,* subd. (c)(2)(D), and "[t]he current offense is connected to prior victimization or childhood trauma" (*id.*, subd. (c)(2)(E)).

## II.

### *Additional Background*

Tran's sentencing memorandum emphasized his difficult life history, struggles to overcome it and successful career in social work; the alcohol use and mental health issues he was contending with at the time of the offense; remorse for the harms he caused; and model behavior while incarcerated. He presented the sentencing question as, " 'Considering Mr. Tran's lifetime of service to others and law-abiding behavior, what does a punishment look like that is proportionate to the harm he caused?' " Tran argued that while he committed violent crimes, he did so in an unusual circumstance unlikely to recur, his life history showed he was not a violent person, and an indeterminate sentence was not needed to protect society.

The sentencing memorandum attached Dr. Matto's report; a video of Tran discussing the incident; numerous letters from friends and colleagues attesting in glowing terms to his character, ability to help others, devotion to

26

family and friends, and positive contributions to his community;[16] and a defense investigator's reports detailing interviews with eight sheriff's deputies, as well as a letter from a sheriff's lieutenant, detailing Tran's consistent exemplary behavior in custody, work ethic, trustworthiness, reliability and caring for others. The deputies viewed Tran as exceptional among inmates, commented on his acceptance of responsibility for his offenses and avoidance of potentially volatile situations, and expressed complete confidence that he would not be a repeat offender.[17]

---

[16] For example, an attorney who had worked with Tran stated that he "has an extraordinary ability to give of himself to other in need" and "stands out" among the social workers and case managers she had worked with over the past 25 years. A social worker described him as "a reliable colleague who consistently stood up for marginalized people and demonstrated repeatedly that he was an asset to our community in which he served"; another described him as exhibiting "nothing short of the highest levels of compassion, commitment, and ethics" and "levels of zeal for the underserved communities we served [that] were quite unparalleled." A past co-worker stated that "[a]nyone knowing Tech could not deny his desire, passion and dedication to serving his community" and believed a "life sentence would be a travesty for not only Tech's family and friends, but to the entire community that benefits from his work." A long-time friend had "seen him pour his sweat and soul to provide for his family" and described him as "smart, dedicated, honest, and loyal." A common theme of these letters was that it would be a loss for the community if Tran received a life sentence and that he would have a strong support network when released.

[17] The deputies' statements were striking for their detailed examples of interactions with Tran and observations of his conduct in jail, and included such comments as an officer saying that he would " 'do anything' " for Tran, that Tran was " 'the only one I'd spoken up for' " in his 11 years on the job, that Tran is the " 'only person in custody I'd ever go out on a limb for,' " and that Tran is " 'a benefit to society' " and the deputy would welcome Tran as a neighbor and have no qualms about Tran being around his family. The officers had had considerable opportunity to become familiar with Tran, as he had been in pretrial custody for over three years by the time they gave their statements in early 2022.

The People sought a sentence of 32 years to life on count 1. The People's sentencing brief described Tran as having committed "vicious, callous and cruel" acts in luring Collaco to his house with carefully planned texts posing as Veronica, lying in wait and attempting to kill him. The People maintained that Tran's "cold, calculated and sophisticated" conduct and willingness to take a stranger's life out of jealousy demonstrated such disregard for human life that he presented an extreme danger to society. The People also noted that the only evidence Tran had suffered trauma came from Tran, without corroboration; Tran lied to the 911 dispatcher, the neighbors, the police and on the witness stand at trial; and the jury's verdict showed it did not find credible or compelling the evidence that the offenses were connected to trauma or mental illness.[18]

At the sentencing hearing, the People argued that "anything less than a life sentence would be wholly inappropriate on the facts and would be disregarding the verdict of the jury in its entirety." Defense counsel argued the factors in mitigation were "overwhelming." The court expressly acknowledged that it had discretion to impose the determinate term Tran requested and, if it imposed an indeterminate term, to dismiss the

_____

[18] The probation report did not address the question of dismissing the enhancement under section 1385 or the length of Tran's sentence, simply recommending that he receive a prison sentence. The report noted that Tran was "widely respected in his social services field" and "admired and well liked in the community," but stated that his "comportment in his professional life is in stark contrast to the incredibly cruel and premeditated attempt to take another person's life." Tran's demonstrated capacity for violence made him a "possible threat to community safety" and, "while there is an overwhelming amount of supportive evidence of [his] positive community impact through his work[,] the heinous nature of the offense is of such magnitude that a commitment to the California Department of Corrections is the only suitable sentencing option."

section 12022.53, subdivision (d) enhancement altogether or to dismiss that enhancement and impose a lesser included one. The court explained the reasoning for its sentencing decisions at great length. While many of its remarks were directed to Tran's request for a determinate sentence, they were also relevant to its decision not to impose the section 12022.53, subdivision (d) enhancement.

The court discussed the constraints on its discretion imposed by the amendments to section 1385, including the requirement to give great weight to any applicable mitigating circumstances set forth in section 1385, subdivision (c)(2) and what it described as the legislative preference for dismissal of enhancements. The court recognized that it had to overcome the legislative preference in the present case due to the application of section 1385, subdivision (c)(2)(C)—the enhancement would result in a sentence of more than 20 years. It found the other two circumstances Tran relied on—section 1385, subdivision (c)(2)(D) (mental illness) and (c)(2)(E) (childhood trauma) did *not* apply because the crimes were committed with a degree of premeditation and deliberation that was contrary to the defense theory (based on Dr. Matto's testimony) that Tran acted with an exaggerated fight or flight response due to his traumatic stress disorder.

The court also discussed the aggravating and mitigating circumstances set forth in California Rules of Court, rules 4.421 and 4.423, finding the aggravating circumstances "heavily outweighed" the mitigating ones. The trial court cited Tran's minimal prior record as a mitigating factor,[19] stated that it had considered his many "great" character references and

---

[19] The only prior offenses listed in the probation report were two misdemeanor counts of driving under the influence committed in June 2006 and September 2007, the second committed while on probation for the first. Grants of probation in both cases had "lapsed routinely."

29

acknowledged that the police officers' vouching for Tran's character and conduct in jail was "an extraordinarily unusual thing." The court found Tran's expression of remorse at the sentencing hearing was genuine, but this mitigating factor had to be balanced against the aggravating circumstances that until he was found guilty, he attempted to evade responsibility and showed no remorse. The court stated, "His expressions today of a full acknowledgment of responsibility are quite different than his expressions under oath to the jury when it was up in the air about whether he would be held accountable or not at all for these offenses."[20] The court emphasized the degree of injury inflicted upon Collaco, which it found "well above" the minimum necessary to prove great bodily injury, and the cruelness of the crime and vulnerability of the victim shown by Tran summoning Collaco to "an enclosed space," a "darkened area with no protection" or "backup," by means of the "fraudulent ruse" of posing as Veronica "over hours of time."

## III.

### *The Trial Court Was Not Required to Strike or Reduce the Section 12022.53 Enhancement.*

Tran contends that section 1385, subdivision (c)(1)(C) required the trial court to strike or reduce the section 12022.53, subdivision (d) enhancement because it resulted in a sentence of over 20 years. He maintains the trial court erred in failing to follow this requirement and asks us to strike or reduce the enhancement.

---

[20] The court viewed Tran as continuing his attempt to evade responsibility for the offenses at trial by testifying that he did not know why he posed as Veronica or summoned Collaco to the house, testimony the jury necessarily found false by "emphatically reject[ing]" it in finding Tran acted with premeditation and deliberation. Similarly, the court stated that Tran was not remorseful at trial "when he denied responsibility and claimed that he didn't know why he was doing what he was doing."

30

" 'The proper interpretation of a statute is a question of law we review de novo.' [Citation.] ' " ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." ' " ' [Citation.]" (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 227-228 (*Gonzalez*).) " ' "If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." [Citation.]' [Citation.] 'In such circumstances, we " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" ' [Citations.]" (*Lipscomb, supra,* 87 Cal.App.5th at p. 18.)

Subparagraph (C) of section 1385, subdivision (c)(2) provides, "The application of an enhancement could result in a sentence of over 20 years. In this instance, *the enhancement shall be dismissed.*" (Italics added.) Of the nine circumstances listed in section 1385, subdivision (c)(2)(A)–(I), only one other includes the language italicized above. That provision states, "Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

31

Tran argues that the italicized language is mandatory and required the trial court to dismiss the section 12022.53 enhancement (or reduce it to a lesser term).[21]  He acknowledges that "many" courts—ours among them—have concluded that this language, when read in the context of the statute as a whole and its legislative history, does not deprive the court of discretion. (*Lipscomb, supra,* 87 Cal.App.5th at p. 17 [rejecting argument that mandatory language of provision requires dismissal of enhancement "notwithstanding the court's discretion and even if the court finds that dismissal of the enhancement would endanger public safety"]; accord, *People v. Mazur* (2023) 97 Cal.App.5th 438, 444 (*Mazur*), review granted Feb. 14, 2024, S283229, review dism. Oct. 23, 2024; *People v. Cota* (2023) 97 Cal.App.5th 318, 335 [construing § 1385, subd. (c)(2)(B)]; *People v. Renteria* (2023) 96 Cal.App.5th 1276, 1284; *People v. Anderson* (2023) 88 Cal.App.5th 233, 241, review granted April 19, 2023, S278786, review dism. Oct. 23, 2024; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 291 (*Mendoza*); *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1098, review granted April 12, 2023, S278894, review dism. Oct. 23, 2024; *People v. Walker* (2022) 86 Cal.App.5th 386, 396 [§ 1385, subd. (c)(2)(B), affirmed but criticized on another point in *People v. Walker* (2024) 16 Cal.5th 1024, 1032-1033 (*Walker*)].)  We are aware of no published case to the contrary.

As we said in *Lipscomb, supra,* 87 Cal.App.5th at page 18, and our sister courts have recognized, although section 1385, subdivision (c)(2)(C) contains what on its face might appear to be a mandatory directive—"[i]n this

---

[21]  A trial court is permitted to "strike the section 12022.53[, subdivision] (d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement [under section 12022.53, subdivisions (b) or (c)] instead." (*People v. Tirado* (2022) 12 Cal.5th 688, 692.)

32

instance, the enhancement shall be dismissed"—"we cannot read this sentence in isolation. [Citations.] Instead, we must consider the statute as a whole, in particular its characterization of the fact that the enhancement could produce a sentence over 20 years as a 'mitigating circumstance' for the court to consider in the exercise of its 'discretion' to strike the enhancement— consideration which, as noted, does not apply at all where the court finds that striking the enhancement would endanger public safety." We noted that this interpretation did not make the language at issue surplusage, since "[a]bsent a finding that dismissing the enhancement would endanger public safety, the language could require the trial court to dismiss the enhancement where it finds that doing so would be 'in the furtherance of justice' under [section 1385,] subdivision (c)(1) . . . ." (*Lipscomb,* at p. 18.)[22] Our review of the legislative history confirmed the Legislature's intent that trial courts "retain the ability to impose an enhancement where failure to do so would endanger public safety." (*Id.* at pp. 18-20.) And we declined to adopt an interpretation of the statute that would lead to the absurd result of requiring dismissal of enhancements such as the one in the present case, section 12022.53, subdivision (d), "in *every* case in which it is charged . . . including where, as here, the trial court made an express finding that failing to [impose it] would endanger public safety." (*Lipscomb,* at p. 20.)

Subsequently, *Mazur, supra,* 97 Cal.App.5th at pages 445-446, held that section 1385, subdivision (c)(2)(C) does not require dismissal even when the trial court has *not* found dismissal of the enhancement would endanger public safety if the court has found dismissal would not be in furtherance of

---

[22] We expressed no opinion on this question because it was not presented in the case. (*Lipscomb, supra,* 87 Cal.App.5th at p. 18.)

33

justice.[23]  *Mazur* explained that under section 1385, subdivision (c)(2),

"absent a finding that dismissal 'would endanger public safety,' the presence

of *any* 'one or more' of the listed mitigating circumstances 'weighs greatly' in

favor of dismissal.  (§ 1385, subd. (c)(2).)  Conversely, if the court finds that

dismissal *would* endanger public safety, then it need *not* give great weight to

the presence of any mitigating circumstance.  In either case, however, the

---

[23]  The California Supreme Court recently reached the same conclusion
as to the mitigating circumstances listed in section 1385, subdivision (c)(2)
generally, although the court did not address the "shall be dismissed"
language of subdivision (c)(2)(B) and (c)(2)(C).  (*Walker, supra,* 16 Cal.5th at
p. 1029.)  The court concluded that under the "plain language of section 1385,
subdivision (c)(2)," "absent a finding that dismissal would endanger public
safety, a court retains the discretion to impose or dismiss enhancements
provided that it assigns significant value to the enumerated mitigating
circumstances when they are present.  (See [*People v.*] *Ortiz, supra,*
87 Cal.App.5th at p. 1098.)  In other words, if the court does not find that
dismissal would endanger public safety, the presence of an enumerated
mitigating circumstance will generally result in the dismissal of an
enhancement unless the sentencing court finds substantial, credible evidence
of countervailing factors that 'may nonetheless neutralize even the great
weight of the mitigating circumstance, such that dismissal of the
enhancement is not in furtherance of justice.' (*Ibid*.)" (*Walker,* at p. 1029.)
        The Supreme Court disagreed with the Court of Appeal's holding that
the statutory " 'mandate to "afford great weight" to mitigating circumstances
erects a rebuttable presumption that obligates a court to dismiss the
enhancement *unless* the court finds that dismissal of that
enhancement . . . would endanger public safety.' " (*Walker, supra,* 16 Cal.5th
at p. 1028, quoting *People v. Walker, supra,* 86 Cal.App.5th at p. 391.)  It
nevertheless affirmed the judgment in *Walker* because, since "the Court of
Appeal upheld the trial court's refusal to dismiss defendant's prior serious
felony enhancement under a presumption in favor of dismissal that could
only be overcome by a finding that dismissal would endanger public safety,
defendant fails to persuade he is entitled to any relief under our less
restrictive understanding of a trial court's authority pursuant to section
1385, subdivision (c)(2)." (*Walker,* at p. 1038.)

court must apply the controlling 'furtherance of justice' standard. (§ 1385, subd. (c)(1).) By Mazur's reasoning, we would have to construe the phrase 'weighs greatly' to mean 'weigh[s] *dispositively*' for the two mitigating circumstances listed in subdivision (c)(2)(B) and (c)(2)(C), but not for the other seven mitigating circumstances. ([*People v.*] *Walker, supra,* 86 Cal.App.5th at p. 397.) 'But that is not what the statute says, and we are not allowed to rewrite the statute.' (*Ibid.*)" (*Mazur,* at pp. 445-446.)

Mazur concluded this interpretation did not render the "shall be dismissed" language meaningless: "In the case of multiple enhancements alleged in a single case, the statute specifies that if the trial court finds dismissal is in furtherance of justice, then 'all enhancements beyond a single enhancement shall be dismissed.' (§ 1385, subd. (c)(2)(B).) This language clarifies that the trial court must leave one and only one enhancement in place if it exercises its discretion to dismiss under this provision. And for any enhancement that could result in a sentence over 20 years, the statute states that 'the enhancement shall be dismissed.' (§ 1385, subd. (c)(2)(C).) This language clarifies that the court must dismiss the charged enhancement if it exercises its discretion to do so, and it cannot simply strike the punishment or the portion of the punishment that would result in a sentence over 20 years." (*Mazur, supra,* 97 Cal.App.5th at pp. 446-447.)

Attempting to convince us to adopt a different interpretation notwithstanding the thus-far unbroken line of cases confirming that the "shall be imposed" language in section 1385, subdivision (c)(2)(B) and (c)(2)(C) is not mandatory, Tran raises several points that he believes the decided cases do not refute. For example, Tran takes issue with courts' reasoning that a literal reading of section 1385, subdivision (c)(2)(C), would constitute an implied repeal of enhancements such as section 12022.53,

subdivisions (c) and (d), which would always have to be dismissed because they necessarily add 20 years or more to a sentence.  (E.g., *People v. Renteria, supra,* 96 Cal.App.5th at p. 1287; *Mendoza, supra,* 88 Cal.App.5th at pp. 296-297; *Lipscomb, supra,* 87 Cal.App.5th at pp. 20-21.)  Tran asserts that the Legislature "meant what it said" by using mandatory language in section 1385, subdivision (c)(2)(C) and suggests its directive can be harmonized with the enhancement statutes by interpreting subdivision (c)(2)(C) as allowing imposition of an enhancement of more than 20 years if the sentence for the crime is itself over 20 years.  Under Tran's interpretation, the enhancement here could be imposed, for example, where the defendant is sentenced for a crime carrying a sentence of 25 years to life (e.g., § 190, subd. (a) [first degree murder]; § 288.7, subd. (a) [specified sex offense with child under age 10]), sentenced in a third strike case (§ 667, subd. (e)(2) or sentenced on multiple counts to consecutive terms totaling 20 years or more.

Although Tran's interpretation allows for the trial court's exercise of discretion in cases involving sentences of more than 20 years independent of the enhancement, it eliminates discretion to impose an enhancement where the crime carries a lesser sentence, even if the trial court finds that dismissal of the enhancement would endanger public safety or would not further the interests of justice.  For the reasons we and other courts have discussed, we decline to adopt this construction.  " 'As the plain text of section 1385 repeatedly emphasizes, its purpose is to grant trial court *discretion* to dismiss enhancements.  And the purpose of Senate Bill No. 81 [(2021-2022 Reg. Sess.)], as reflected in the Legislative Digest, is to encourage exercise of that discretion by making dismissal mandatory *if it is in the furtherance of justice to do so.*' ([*People v.*] *Walker, supra*, 86 Cal.App.5th at p. 397 . . . (second

36

italics added); see Legis. Counsel's Dig., Sen. Bill No. 81, Stats. 2021, ch. 721 (2021-2022 Reg. Sess.).) 'In other words, the dismissal of the enhancement is conditioned on the court's finding dismissal is in the interest of justice.' (*Anderson, supra*, 88 Cal.App.5th at p. 239.)" (*Mazur, supra,* 97 Cal.App.5th at p. 446.)

Here, the trial court found that dismissal of the enhancement would endanger public safety and would not further the interests of justice. Section 1385, subdivision (c)(2)(C) did not require the court to dismiss the enhancement despite these findings.

## IV.

### *Dismissal of the Section 12022.53, Subdivision (d) Enhancement Based on Evidence of Mental Illness and Childhood Trauma*

Tran contends the trial court misconstrued the requirement to give great weight to evidence of mental illness and childhood trauma in determining whether to dismiss an enhancement. He argues the court misunderstood the statutory definition of "connected to," which in his view means these mitigating circumstances applied as long as they played even a minor role in his commission of the offense, and abused its discretion in finding they did not play at least a minor role. He further challenges the court's reasoning for what he sees as contradictions between the court's conclusion that his mental disorder and childhood trauma were not connected to the offense and its stated reasoning for declining to dismiss the section 12022.53, subdivision (d) enhancement.

We review a trial court's decision not to strike sentence enhancements under section 1385 for abuse of discretion. (*Gonzalez, supra,* 103 Cal.App.5th at p. 225; *Mendoza, supra,* 88 Cal.App.5th at p. 298.) "The abuse of discretion standard is highly deferential. When, ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion

37

'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citations.]" (*Mendoza*, at p. 298.) " '[A]n abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard.' [Citations.]" (*Gonzalez,* at p. 225.)

### A. The Statutory Meaning of "Connected to the Offense"

Under section 1385, subdivision (c)(2), proof that the current offense "is connected to mental illness" (§ 1385, subd. (c)(2)(D)) or "is connected to prior victimization or childhood trauma" (*id.,* subd. (c)(2)(E)) "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

Section 1385, subdivision (c)(5) and (c)(6), provide further guidance on application of these factors. Subdivision (c)(5) defines "mental illness" and provides that a court "may conclude that a defendant's mental illness was connected to the offense" if, after reviewing the evidence, "the court concludes that the defendant's mental illness substantially contributed to the defendant's involvement in the commission of the offense."[24] Section 1385,

---

[24] Section 1385, subdivision (c)(5), provides in full: "For the purposes of subparagraph (D) of paragraph (2), a mental illness is a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder but excluding antisocial personality disorder, borderline personality disorder, and pedophilia. A court may conclude that a defendant's mental illness was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with

subdivision (c)(2)(6) similarly provides that the court may conclude a defendant's childhood trauma or prior victimization "was connected to the offense" if it finds the childhood trauma or prior victimization "substantially contributed to the defendant's involvement in the commission of the offense." " 'Childhood trauma' means that as a minor the person experienced physical, emotional, or sexual abuse, physical or emotional neglect." (§ 1385, subd. (c)(6)(A).) " 'Prior victimization' means the person was a victim of intimate partner violence, sexual violence, or human trafficking, or the person has experienced psychological or physical trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (*Id.,* subd. (c)(6)(B).)[25]

---

the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental illness substantially contributed to the defendant's involvement in the commission of the offense."

[25] Section 1385, subdivision (c)(6), provides in full:

"For the purposes of this subdivision, the following terms have the following meanings:

"(A) 'Childhood trauma' means that as a minor the person experienced physical, emotional, or sexual abuse, physical or emotional neglect. A court may conclude that a defendant's childhood trauma was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, medical records, or records or reports by qualified medical experts, the court concludes that the defendant's childhood trauma substantially contributed to the defendant's involvement in the commission of the offense.

"(B) 'Prior victimization' means the person was a victim of intimate partner violence, sexual violence, or human trafficking, or the person has experienced psychological or physical trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. A court may conclude that a defendant's prior victimization was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to,

Section 1385 does not define the phrase "substantially contributed to" used in subdivision (c) to define whether a circumstance is "connected to" the offense.  Tran argues the phrase should be understood as referring to the " 'substantial factor' test of causation" used in both criminal and civil cases.  (E.g., *In re M.S.* (1995) 10 Cal.4th 698, 716; *People v. Caldwell* (1984) 36 Cal.3d 210, 220; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968.)  " ' "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."  [Citation.]  Thus, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" [citation], but a very minor force that does cause harm is a substantial factor [citation].' " (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 298, quoting *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)

The Legislature did not use "substantial factor" to describe the connection required for application of the mitigating circumstances described in section 1385, subdivision (c)(2)(D) and (c)(2)(E); it used the phrase "substantially contributed to."  In common usage, the terms "substantially" and "substantial" indicate something more than a non-theoretical or "minor" force.  The Oxford English Dictionary defines "substantially" as "[f]ully, amply; to a great extent or degree; considerably, significantly, much." (<https://www.oed.com/search/advanced/Meanings?textTermText0=substantially&textTermOpt0=WordPhrase> [as of Nov. 7, 2024].)  Dictionary

---

police reports, preliminary hearing transcripts, witness statements, medical records, or records or reports by qualified medical experts, the court concludes that the defendant's prior victimization substantially contributed to the defendant's involvement in the commission of the offense."

40

definitions of "substantial" include "[o]f ample or considerable amount or size; sizeable" (Oxford English Dict. <https://www.oed.com/search/advanced/Meanings?textTermText0=substantial&textTermOpt0=WordPhrase> [as of Nov. 7, 2024]) and "considerable in amount, value, or worth" (Merriam-Webster's Unabridged <https://unabridged.merriam-webster.com/unabridged/substantial> [as of Nov. 7, 2024].) Tran points to no authority for his assumption that the Legislature intended "substantially contributed to" to have the meaning of the legal term of art "substantial factor" rather than the meaning the words would normally convey. Nor does he suggest why, if that was the Legislature's intent, it did not simply use "substantial factor" in the statutory definition of "connected to." " ' "[W]hen the Legislature uses a term of art, a court construing that use must assume that the Legislature was aware of the ramifications of its choice of language." ' " (*People v. Gonzales* (2017) 2 Cal.5th 858, 871.) Conversely, we may assume that, if the Legislature intends a statute to have the meaning and effect of a legal term of art, it will use that term of art in the text of the statute.

As a leading treatise explains, the Legislature likely intended the term to impose a fairly demanding standard. (Couzens, et al., Sentencing California Crimes (The Rutter Group 2023) § 12:11.) "The use of the phrase 'substantially contributed' is unclear. Likely it is the intent of the Legislature that the factor plays some significant role in the commission of the crime or the defendant's involvement. In other circumstances, the Legislature used the phrase 'a contributing factor in the commission of the offense.' (See, *e.g.*, § 1170, subd. (b)(6) [Factor affecting imposition of the low term of imprisonment].) While 'contributing factor' suggests the court must find the factor to have some connection, however slight, [to] the commission

41

or circumstances of the crime, the phrase 'substantially contributed' clearly implies a factor more significant in weight from that of 'contributing factor.' " (*Id.,* F. (4), (5).) As Couzens notes, the same Legislature enacted both the amendment adding the "substantially contributed" test to section 1385 and the amendment adding the "contributing factor" test to section 1170. (*Ibid.*) That circumstance strengthens the inference that it intended "substantially contributed" to mean something more than "contributing factor." (*Ibid.*)

In short, we are not persuaded that the Legislature intended the phrase "substantially contributed" in section 1385, subdivision (c)(2)(D) and (c)(2)(E), to impose the "substantial factor" standard.

## B. The Trial Court's Exercise of Discretion

As the court described the defense theory, based on Dr. Matto's testimony, "because of his PTSD, because of his personal life experiences, and this unspecified diagnosis of mental illness or disorder," when presented with "certain life triggers," Tran's fight or flight impulse "would occur faster than someone who hadn't suffered from the PTSD, hadn't been inflicted with the same life trauma, and that his reaction would not only be faster but it would be more intense."[26] The trial court concluded the statutory mitigating circumstances relating to mental illness and childhood trauma were inapplicable because the jury's findings of premeditation, deliberation and intent to kill, torture and commit aggravated mayhem showed it rejected the defense theory and the trial court found the theory incompatible with the overwhelming evidence of deliberation and premeditation.

---

[26] As described earlier, Dr. Matto testified that Tran did not meet the diagnostic criteria for PTSD but instead suffered from "other specified trauma and stressor related disorder." We assume the trial court's reference to "PTSD" was, in effect, a shorthand for Tran's trauma related disorder.

42

The court described at length the evidence showing that Tran "didn't act in the spur of the moment, but acted with extraordinary amounts of deliberation and planning both before and after and during this crime."[27] After detailing the evidence, the court continued, "This is all premeditated, deliberative behavior. ∴ . . . [T]his action was not an exaggerated response in the heat of the moment or a quickened fight or flight response—fight or flight response to an immediate trigger. [¶] He saw these things on the cell phone

---

[27] Elaborating on this point, the court stated that the evidence showed "[t]hat he, himself, texted Mr. Collaco and acted repeatedly for hours under a ruse that he was Ms. Tran, not himself. · That when Mr. Collaco began to doubt that it was Ms. Tran on the other end of the call or the text that Mr. Tran was able to dissuade him of that by texting nude photographs or sexy photographs, intimate photographs of Ms. Tran to Mr. Collaco to convince him that it was still Ms. Tran on the other end of that phone. · This happened over a period of hours. · Mr. Tran invited him over. · Mr. Tran was given constant opportunities to back off his plan to harm or to meet with Mr. Collaco. · He turned down every one. . . .

"Mr. Tran loaded a gun. · He had extra shells in his pocket. · He was able to turn off any lights that were there.  He knew that his wife was asleep or otherwise incapacitated by intoxicating alcohol. · He immediately shot Mr. Collaco as soon as he opened that gate. · He ran up. · He pushed the door shut so he wouldn't escape. · And he repeatedly, at one point there were estimates by Mr. Collaco that he lost count, estimates of several dozen blows to the head by Mr. Tran. ∴ . . . [I]t was sufficient blows to the head to cause 31 staples and continuing ongoing great bodily injury to this day . . . .

"After this was committed and only with full intent to torture and to commit aggravated mayhem, and to kill in premeditating fashion . . . it was only interrupted and intervened by Mr. Collaco being able to get out of the closed gate, and by virtue of the neighbor coming over and stopping Mr. Tran from approaching Mr. Collaco and finishing the job, for lack of a better word. . . .

"But there was premeditation even after this crime.  There was the tossing of the cell phone, of Mr. Collaco's cell phone over the fence hoping to dispose of it, and . . . there's the deleting of the text messages on his wife's phone, which he kept on his pocket. · There's the calling and reporting of this as an intruder break-in."

and that was [the] point where he could be triggered and angry.· He chose then to invite Mr. Collaco over through this elaborate ruse which demonstrates great planning and not someone who's acting under the influence of some PTSD or under the influence of poor judgment in the heat of the moment. [¶] He had choices for hours to back off, and he didn't.  And that is the product of choice, not PTSD, and not some unspecified mental health disorder.

The court applied the same analysis in finding the offense was not connected to childhood trauma.  In addition, the court noted and agreed with the prosecutor's argument at trial that Collaco was "not connected to" or "responsible for" Tran's childhood trauma and stated, "[t]his was adult trauma related to his failing marriage," which "was failing in large part due to Mr. Tran's own actions and infidelity, repeated infidelity over a period of time. . . . [T]o the extent he was triggered by Mr. Collaco wanting to get with his wife on that day, Mr. Collaco was not the one who committed the prior infidelity to put Mr. Tran in that position to be triggered.· His failures within his marriage were his own and cannot be attributed to either his childhood trauma or to any actions of Mr. Collaco."

Tran argues the court contradicted its finding that his mental illness was not connected to the offense when it later focused on his mental health in finding dismissal of the section 12022.53, subdivision (d) enhancement would endanger public safety because Tran had not received mental health treatment.  He maintains this contradiction shows the court failed to apply the proper standard of proof or draw reasonable inferences from the evidence of mental illness and childhood trauma.

We disagree.  The court's remarks about Tran's mental health in the context of considering whether dismissal of the enhancement would endanger

44

public safety were presented as a hypothetical: The court stated that "*even if*" it was to find mental illness was a contributing factor, there was no evidence Tran had received any treatment that would prevent him from reacting to a future trigger in a similarly harmful way. In the course of several reiterations of this point, the court emphasized it was *not* finding any mental illness was a contributing factor.[28] As we understand the court's remarks, it was reinforcing its conclusion that a lengthy prison sentence was necessary by pointing out that "even if" mental illness played a role in Tran's conduct, this did not reduce the danger he presented.

Tran further argues that while the court had earlier "exhibited an understanding of how the mental health and childhood trauma factors were connected to the offense, as outlined in the cases cited above, without serving as a complete defense," it contradicted that understanding at sentencing by concluding that Tran's offenses were not connected to mental illness and childhood trauma because the jury rejected these factors as having "excused" the crime. Tran contends the trial court abused its discretion because the

---

[28] The court stated, "*Even if* the jury had found [the claim of mental illness] compelling or the Court, . . . there's no evidence on this record that the defendant has received treatment . . . such that, if he was to be let out of custody he wouldn't engage in a fight or flight response that involved an intensely and suddenly attacking and harming other people with a similar degree of violence"; "to the extent that he might be suffering from mental illness, *even if* the Court were to accept that, there is no plan before the Court to address that"; "*even if* the Court were to find that—as I'm not doing—but *even if* I were to find that the mental illness was a contributing factor, either to the crimes themselves or to his likelihood to re-offend in the future, the problem is . . . that this type of crime[,] its deliberation, its intense violence, there's nothing secure before the Court or presented to the Court that any underlying issues have been dealt with or treated in a way to prevent this from happening again." (Italics added.)

45

Legislature did not intend for the mitigating circumstances in section 1385, subdivision (c)(2) to apply only if they defeated liability for the charged offenses.

First, as indicated by Tran's reference to the cases "outlined . . . above," his argument assumes that section 1385 calls for analysis pursuant to the "substantial factor" test. In his view, as earlier discussed, Dr. Matto's testimony established that Tran's unspecified trauma disorder, caused by his childhood trauma, was "at the very least a 'minor factor' that caused the harm." As we have explained, we disagree that the minimal contribution required under the substantial factor test is the proper measure of "connected to" and "substantially contributed to" for purposes of section 1385, subdivision (c)(2).

Second, we disagree with Tran's interpretation of the discussion he sees as reflecting the court's understanding that mental illness and childhood trauma could be connected to the offense without constituting a complete defense. The discussion concerned the defense request for an instruction directing the jury that it could consider evidence of a mental impairment only for the limited purpose of determining whether Tran acted with the specific intent required for counts 1, 2 and 3. Over the prosecutor's objection that there was insufficient evidence Tran's trauma disorder impaired his ability to form the necessary intent, the court decided to give the instruction because, while the evidence would allow the jury to reasonably conclude that Tran acted with the required specific intent even if it believed Dr. Matto's testimony that he suffered from trauma related disorders, the jury could also find Tran "acted without having the required intent precisely because he had those disorders. · There is enough here for them to make that determination." Nothing in this discussion addressed the question whether mental illness or

46

childhood trauma could be connected to the offense within the meaning of section 1385, subdivision (c)(2)(C), if the jury found Tran acted with premeditation and deliberation.

As for whether the trial court abused its discretion in finding the crimes were not connected to mental illness and childhood trauma, Tran is certainly correct, as a general principle, that circumstances insufficient to constitute a complete defense may still influence determination of the appropriate sentence. Were it otherwise, there would be no point to section 1385, subdivision (c) because the existence of the mitigating circumstance would mean the defendant could not be convicted in the first place.

That said, in the present case the trial court did not act arbitrarily in describing the tension between the jury's finding that Tran attempted to kill Collaco with premeditation and deliberation, on the one hand, and the theory, as described by Dr. Matto, that Tran's childhood abuse and mental illness substantially contributed to the offense. Dr. Matto testified that individuals with the trauma related disorder he diagnosed in Tran may have an exaggerated response to stressors, including having a lower threshold for, and more intense form of, the "instinctual" fight or flight reaction. He also testified that individuals with trauma related disorder may experience a dissociative episode in which they have "an altered relationship with what is happening around them."

The jury found Tran acted willfully, with deliberation and premeditation. The court instructed the jury that to reach that verdict, it had to find he "intended to kill when he acted," "carefully weighed the considerations for and against his choice and knowing the consequences decided to kill" and "decided to kill before completing the act of attempted

47

murder." It was further instructed that although "a cold calculated decision to kill can be reached quickly," "[a] decision to kill made rashly, impulsively or without careful consideration of the choice and its consequences is not deliberate and premeditated," and the "test is the extent of the reflection not the length of time." The jury's verdict indicates it did not find that Tran acted rashly or impulsively in attempting to kill Collaco and that it did find he formed the intent to kill before committing the acts, having weighed the pros and cons and considered the consequences.

It is not an overstatement to view Dr. Matto's description of a person acting in the midst of an exaggerated fight or flight reaction caused by trauma related disorder as hard to reconcile with the jury's premeditation findings. According to Dr. Matto, the fight or flight response is "instinctual," which is generally the opposite of intentional, conscious and deliberate.[29]

Still, the trial court's remarks explaining its finding of no substantial connection are ambiguous and in some respects incorrect. At one point, the court indicated it was finding the offenses were not connected to mental

---

[29] "Instinctual" is defined as "happening naturally, as a result of instinct, rather than being thought about, planned, or developed by training." (Cambridge Dict. <dictionary.cambridge.org/us/dictionary/English/instinctual> [as of Nov. 7, 2024].) Synonyms of instinctual include terms such as automatic, spontaneous and reflex; antonyms include conscious, intentional and deliberate. (Merriam-Webster Thesaurus <merriam-webster.com/thesaurus/instinctual> [as of Nov. 7, 2024].) (See *People v. Thomas* (1992) 2 Cal.4th 489, 517-518 & fn. 8 [defendant's act of reloading gun "hardly involves the sort of involuntary, *instinctive*, or unlearned response that may properly be called a reflex" and instead, together with other facts, "strongly suggests premeditation"], italics added; *People v. Cortez* (2011) 192 Cal.App.4th 873, 893 [describing psychiatrist's report stating defendant "was acting more *instinctually* than with reason, judgment, premeditation or contemplation"], italics added.)

48

illness or childhood trauma *because* the jury found this evidence did not "*excuse*[]" the offenses. (Italics added.) In other comments, the court appeared to understand the difference between the "connection" requirement for sentencing and the specific intent requirement for liability: "Indeed, the contention that it was *connected in any way to mental illness* is not corroborated by any other testimony, other than the defendant's own supplied to Dr. Matto." (Italics added.) But one of the court's stated reasons for finding the offense was not connected to childhood trauma reflects a misunderstanding of the requirement: The prosecutor argued there was no connection because Collaco was not responsible for Tran's childhood trauma, and the trial court agreed. This reasoning is erroneous in two respects. First, whether the victim was responsible for the defendant's childhood trauma is not relevant to the question whether that trauma contributed to the defendant's offense. If the childhood trauma factor only applied when the victim caused the childhood trauma, section 1385, subdivision (c)(2)(D) would apply only to a very narrow class of crimes, such as those involving violence against abusive parents or guardians or child molesters who molested a defendant. Nothing in the statute supports such a narrow interpretation. Second, the point of the childhood trauma evidence was that it can affect the manner in which a person responds to triggering events later in life. The deterioration of Tran's marriage was the immediate stressor that triggered Tran's violent response to Collaco's sexual relationship with his wife, but according to Dr. Matto, the trauma disorder affecting his marriage in turn resulted from trauma in Tran's family of origin, suffered long before he knew either his wife or Collaco.

Given the ambiguity and errors in the trial court's explanation of its rejection of the connection requirement which may have affected its analysis, we will remand this issue for reconsideration in light of this opinion.

## V.

### *The Trial Court's Decision to Impose the Maximum Enhancement Based on Public Safety and the Interests of Justice Must Be Reconsidered.*

Tran contends the trial court erred in declining to dismiss or reduce the section 12022.53, subdivision (d) enhancement based on the danger to public safety the court believed Tran posed at the time of sentencing rather than whether, if the enhancement was dismissed or reduced, he would pose a danger at the time he would be eligible for release.

### A. The Issue Was Not Forfeited

The People contend that Tran forfeited this argument because he "never asked the trial court to focus on whether he would present a danger at the time he was eligible for parole at some future date." The People are incorrect. Defense counsel argued at sentencing that if the court used count 1, 2 or 3 as the base term, it was "necessarily going to sentence Mr. Tran to seven years to life in prison. [¶] ·In considering whether the dismissal of the [section] 12022.53[, subdivision] (d) enhancement would endanger public safety, the Court would have to believe that a sentence of seven years to life would be insufficient to ensure public safety and that the additional sentence of 25 to life on top of that would be required in order to protect the public. · That's clearly not the case here." This argument clearly asked the court to consider the sentence Tran would receive if the enhancement was dismissed or reduced and whether he would present a danger at the end of that sentence.

50

The People also argue Tran's contention is not "ripe" for review because it requires the court to "speculate what type of danger [Tran] would be at the time he is eligible for his first parole hearing had it dismissed the firearm enhancement." This argument appears to assume the trial court was limited to evaluating Tran's dangerousness at the time of the sentencing hearing; indeed, the People argue that Tran "speculates when he claims that the trial court has to consider his dangerousness to public safety as if the enhancement was dismissed." Again, the People are incorrect. Section 1385 provides that " '[e]ndanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." As will be discussed further below, the plain language of the statute requires the trial court to do exactly what Tran asked it to do: Consider whether, if it dismissed the section 12022.53, subdivision (d) enhancement, Tran's release at the end of the sentence otherwise imposed would endanger public safety. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228.)

**B. Analysis**

The argument Tran advances here was recently accepted in *Gonzalez, supra,* 103 Cal.App.5th at page 230, which held the trial court abused its discretion in considering "only whether Gonzalez *currently* posed a danger to the public when assessing if a dismissal of the firearm enhancement would 'endanger public safety.' (§ 1385, subd. (c)(2).) In light of Gonzalez's sentence of 50 years to life for the murder conviction, the trial court also should have considered the date on which Gonzalez could be released if the firearm enhancement was dismissed and the fact that the release would be subject to a review by the Board of Parole Hearings and the Governor." (*Gonzalez,* at pp. 230-231.) We agree with the *Gonzalez* court's conclusion that

51

section 1385, subdivision (c)(2) requires consideration of a defendant's dangerousness at the time the defendant would be released if the enhancement was dismissed.

The defendant in *Gonzalez* was sentenced to a term of 50 years to life for first degree murder, plus 25 years to life for a section 12022.53, subdivision (d) enhancement. (*Gonzalez*, 103 Cal.App.5th at pp. 220-221.) The trial court declined to strike the enhancement based on finding the defendant " 'presently . . . does represent a danger to society,' " rejecting the defendant's argument that the court should consider the facts that he was going to serve a minimum of 25 years to life even if the enhancement was dismissed and his release would be subject to review by the parole board and governor. (*Id.* at pp. 223-224.)

Reversing, *Gonzalez* explained: "The plain words of the statute do not support the trial court's singular focus on whether the defendant *currently* poses a danger. Notably, section 1385, subdivision (c)(2) focuses on the danger associated with the dismissal of an enhancement, phrasing the inquiry as whether '*dismissal of the enhancement* would endanger public safety,' and whether 'there is a likelihood that *the dismissal of the enhancement* would result in physical injury or other serious danger to others.' (§ 1385, subd. (c)(2).) Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence. A currently dangerous defendant who will be released from prison within a short time frame might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he

is elderly.  (See *Mendoza, supra*, 88 Cal.App.5th at p. 299, 304 Cal.Rptr.3d 624 [affirming the trial court's finding of a danger to the public under § 1385, subd. (c)(2) where 'dismissal of the enhancement would result in a sentence of less than six years in prison, which would require [the defendant's] immediate release'].)  Further, an inquiry into whether public safety will be endangered by the dismissal of an enhancement for a defendant serving a lengthy indeterminate sentence should also take into account that the defendant's release from prison is contingent on review by the Board of Parole Hearings (and for murder convictions, by the Governor), who will have the opportunity to assess the defendant's dangerousness at that time. (§§ 3041, 3041.2; Cal. Const., art. V, § 8.)  That future review will act as a safety valve against a release that would endanger the public and is relevant to a trial court's analysis of whether the dismissal of an enhancement imposed on a defendant serving an indeterminate prison term will endanger public safety."  (*Gonzalez, supra,* 103 Cal.App.5th at p. 228.)

The present case differs from *Gonzalez* in that the trial court in *Gonzalez* expressly limited its decision to current dangerousness and declined to consider whether the defendant would remain dangerous at the end of the sentence the defendant would serve without the enhancement.  Here, the court accurately stated that because one of the mitigating factors had been proven (§ 1385, subd. (c)(2)(C)), it was required to weigh this factor "greatly in favor of striking the enhancement" unless it found that "dismissal of the enhancement would endanger public safety, which is defined as a likelihood that dismissal of the enhancement would result in physical injury or serious danger to others."  It then stated that "[o]nly with the sufficient amount of time and due reflection and . . . an intense and lengthy period of reflection on Mr. Tran's part does the Court have any hope that he would not do this

again, whether provoked justifiably or not."  In stating the court's view that Tran would remain a danger to public safety if released without serving a "lengthy" sentence, this remark implicitly addressed the question whether Tran would endanger the public if released at a given time in the future,.

Yet many of the court's comments reflected a focus on the danger Tran posed *at the time of the hearing*.  The court stated that "[*a*]*s it exists now, as it stands now*, he does remain a serious danger, if not to Mr. Collaco, to society in general"; that he "does *currently* pose an extreme public safety risk to Mr. Collaco directly and to the public in general"; and that "he *demonstrates* an extreme risk to public safety and to Mr. Collaco" and "he definitely *presents* a public safety risk going forward."  (Italics added.)  The court stated that it was optimistic Tran would become suitable for release in time but did not believe "that's the case *now*" and in fact believed that "if presented with a similar trigger,  if released in the near future on a determinate term, he poses a great danger to the public."  (Italics added.)  This last remark referenced Tran's request to be sentenced to a determinate term on count 4 rather than a life term:  The court concluded a determinate term of 14 years[30] would be inappropriate and disproportionate to his offenses, and that it would not be in the interest of justice for him to be entitled to release without having to "engage in the hard work" to demonstrate his readiness to a parole board and the parole board "weighing in on his performance and continued exercise of remorse and good behavior."  The court stated it was "electing not

---

[30] The parties had indicated the maximum term for count 4 would be 14 years, but the court pointed out that because no aggravating circumstances were proven to the jury, sentence on this count would be limited to middle terms unless Tran stipulated to the existence of aggravating factors.  (§ 1170, subd. (b).)  Defense counsel stated that if the court chose to sentence on count 4, Tran would so stipulate.

to strike the enhancements if I impose one of the life terms" because, "while the law creates a presumption that I should strike the enhancement, I believe that that presumption is overcome by the great risk to public safety that he presents and to the victim's safety that he *presents today*." (Italics added.)

Overall, we cannot escape the conclusion that the court focused primarily on Tran's dangerousness at the time of sentencing rather than the danger he would pose at the time he becomes eligible for release, at least with respect to the court's discretion to impose an enhancement pursuant to subdivisions (b) or (c) of section 12022.53 rather than the maximum enhancement pursuant to subdivision (d). This is the aspect of the court's decision that we find problematic.

The court made clear that it believed a 14-year determinate sentence, *without further review prior to release*, would not be sufficient to ensure Tran did not remain a danger to the public. As we have noted, Tran has not challenged this part of the court's ruling. Further, in declining to dismiss the section 12022.53, subdivision (d) enhancement altogether, the court made clear its view that seven years (the minimum term for a life sentence for attempted murder) would be an insufficient sentence even with review by the parole board prior to release. Given the seriousness of the crimes in this case, this decision was not so arbitrary that we could find the court abused its discretion in declining to dismiss the enhancement altogether.

The court expressly recognized, however, that it had discretion to reduce the length of the enhancement by dismissing the 25 years to life enhancement under section 12022.53, subdivision (d) and replacing it with an enhancement of 20 years to life under section 12022.53, subdivision (c) or 10 years to life under subdivision (b). The court explained its decision to reject either of these alternatives without offering any reason for concluding

55

Tran would remain a danger to the public after serving a minimum sentence of 17 years (10-year enhancement) or 27 years (20-year enhancement), at the end of which the parole board would evaluate whether he remained a danger. Instead, the court referred to the "great danger that *is* posed," stated that Tran would have "a good chance" to be released by the parole board in his late 60s with the 25-year enhancement and at that point "would have a lot of life ahead of him," and stated that imposing the 10- or 20-year enhancement would not "do justice to the crime." (Italics added.)

While current dangerousness is an appropriate factor to consider (*Gonzalez, supra,* 103 Cal.App.5th at p. 228), the question whether "dismissal of the enhancement would endanger public safety" (§ 1385, subd. (c)(2)) can only be answered by comparing the danger of releasing the defendant at the end of the sentence including the enhancement with the danger of release at the end of the sentence that would remain if the enhancement was not imposed. The role of the dangerousness finding is critical to implementation of the legislative preferences embodied in section 1385, since a finding that dismissal of the enhancement would endanger public safety means the subdivision (c)(2) mitigating circumstances need not be given "great weight." (*Mazur, supra,* 97 Cal.App.5th at p. 445.)

Here, if dismissal of a section 12022.53, subdivision (d) 25-year enhancement, would *not* endanger public safety, the fact that it would result in a sentence of well over 20 years (minimum parole eligibility of 32 years) would "weigh[] greatly in favor of dismissing" it. (§ 1385, subd. (c)(2)(C).) This would be the case if Tran could be released without endangering public safety after serving 17 years (10-year enhancement) or 27 years (20-year enhancement). But these determinations each depended on evaluation of the danger Tran would pose at the time of release, not at sentencing. The court

could not properly conclude dismissal of the section 12022.53, subdivision (d) enhancement would endanger the public unless it determined that a minimum term of 17 or 27 years, with release only upon a parole board's determination of suitability, would be insufficient to protect the public.

The court's failure to meaningfully consider dangerousness at the relevant points in the future when Tran would become eligible for release is troubling for additional reasons. Our Legislature has recognized that "[r]esearch shows that criminal involvement diminishes dramatically after an individual reaches 40 years of age and even more after 50 years of age." (Stats. 2021, ch. 719, § 1(d)(4) [§ 1170].) Tran was 37 years old when he committed these offenses and 41 at sentencing, already at an age when criminal conduct would be expected to diminish. The trial court's only comment about Tran's age was that, with the 25-year enhancement, he would be eligible for release in his late 60s, with "a lot of life ahead of him." Actually, with the sentence of 32 years to life, Tran would not become eligible for release until age 73; with the lesser 10- or 20-year enhancements, he would become eligible at 58 or 68 years of age. Under any of these alternatives, Tran would be well into a stage of life with significantly diminished expectation of criminality before he could even be considered for parole. The trial court's comment about Tran having "a lot of life ahead of him" if released after 32 years says nothing about whether he would be a danger at the time of potential release if a lesser enhancement was imposed.

Moreover, the trial court multiple times expressed its optimism that Tran would be able to earn release when he became eligible. The court stated, "for the benefit of a parole board down the road—that there is much positive to say about Mr. Tran and I do believe that he can overcome his demons to the point where at some point he would be suitable for release,"

57

although the court did not "believe that that's the case now." The court stated that Tran had "a strong chance of getting out of custody given his performance in custody to date, the great character reference letters offered by the jailers," that the court had "great optimism that he would because of his excellent behavior in . . . jail custody up to this point," and the court had "a strong view" that Tran would "convince a parole board to cut him loose as soon as he is eligible."[31] These expressions of optimism are difficult to square with the court's conclusion that a minimum sentence of 32 years was required and minimum sentences of 17 years or 27 years would be insufficient even though Tran would not actually be released if the parole board found he still presented a risk to public safety. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228; § 3041.) To be sure, the court emphasized its view that a "lengthy" minimum sentence was necessary—but any of these alternative sentences would fit that definition. The court gave no indication that it considered whether Tran would be a danger to the public if released after serving a minimum of 17 years or 27 years upon a parole board's determination that he was no longer dangerous.

The court's decision not to dismiss or reduce the enhancement was not based solely on its view of Tran's dangerousness. As indicated above, it emphasized the seriousness of the crimes and explained its view that the

---

[31] The court's stated optimism that Tran would be able to earn release on parole was based on the "excellent" behavior in prison attested to by the police officers' character statements (recognized by the court as being "extraordinarily unusual") and the fact that there was "much positive to say" about Tran. The latter, presumably, referred to the many letters from Tran's friends and colleagues describing his dedication to helping others and positive impact in personal relationships and on the community. The record suggests Tran's violent crimes were a singular departure from his usual character and conduct, but the court gave this circumstance little weight in its sentencing decision.

maximum sentence was appropriate for purposes of deterrence, both for Tran and as a message to others who might commit such crimes. Noting that the objectives of sentencing include deterrence as well as rehabilitation and punishment, the court stated that "this sentence isn't just about Mr. Collaco or Mr. Tran" or their family members but "about others looking to this Court and to this sentence for justice and looking to whether or not they should commit this crime and knowing that it won't be tolerated" and "the Court is prepared to lock them up for an extremely lengthy time."

As the trial court stated, the California Rules of Court provide that deterrence is one of the objectives of sentencing. (California Rules of Court, rule 4.410, subd. (a)(3) & (a)(4) ["General objectives of sentencing include . . . deterring [defendant] from future offenses [and] [d]eterring others from criminal conduct by demonstrating its consequences"].) At the same time, in adopting sentencing reforms in recent years, the Legislature has recognized research showing that lengthy sentences "have diminishing returns in reducing crime rates," with "almost no evidence that long sentences deter the crimes they are intended to deter." (Stats. 2021, ch. 719, § 1(d)(3), (4) [legislative findings and declarations]; *Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 496 [quoting Sen. Com. on Public Safety, Rep. on Sen. Bill No. 620 (2017-2018 Reg. Sess.) Mar. 28, 2017, p. 3 [mandatory sentence enhancements have " 'no material deterrent effect' "].) The amendments to section 1385 are in keeping with this legislative recognition, but the trial court does not appear to have considered it.

The court's sentencing decisions were heavily influenced by the seriousness of Tran's offenses. The premeditation and deliberation reflected in Tran's conduct, extreme injury inflicted on Collaco and evidence indicating Tran could well have killed him if not stopped by the intervention of his

59

neighbor all led the court to believe a maximum sentence was appropriate. As we have said, even without a determination that Tran would pose a danger to the public if the court did not impose the maximum enhancement, the court had discretion to impose that enhancement if it concluded imposition of a lesser enhancement would not serve the interests of justice. (*Walker, supra,* 16 Cal.5th at p. 1029; *Mazur, supra,* 97 Cal.App.5th at pp. 445-446; § 1385, subd. (a).)

But the court in fact *did* base its decision in large part on its view of Tran's dangerousness. The court emphasized the danger Tran posed to Collaco and the public *at the time of sentencing* and did not provide any reason to conclude that only a minimum term of 32 years could ensure public safety even though, regardless of the length of the minimum term, Tran would not be released absent a parole board's determination that he did not pose a danger. To the extent the court's decision was based on the danger Tran posed at the time of sentencing without consideration of danger at the alternative potential dates of release, the court erred. Reliance on an incorrect legal standard constitutes an abuse of discretion. (*Gonzalez, supra,* 103 Cal.App.5th at p. 225.)

We cannot find this error harmless. The court's view of the nature of the crime and need for deterrence was intertwined with its focus on Tran's current dangerousness, and the court expressed considerable optimism about Tran's future based on his positive character references and conduct in custody. Given the totality of the court's remarks, we cannot be confident its decision would be the same upon consideration of the facts under the standards we have discussed. In reaching this conclusion, however, we do not intend to dictate the court's decision on remand. The ultimate decision— whether dismissal or reduction of the section 12022.53, subdivision (d)

60

enhancement is in furtherance of justice—is a matter for the trial court's discretion, guided by statutory standards.

## DISPOSITION

The sentence is vacated and the matter remanded for resentencing in accordance with the views expressed in this opinion.  In all other respects the judgment is affirmed.

_____

STEWART, P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

*People v. Tran* (A165297)